UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| BRADY MEYER, | Case No. 13-CV-3197 (PJS/BRT) |
| Plaintiff, | |
| v. | ORDER |
| INTERSTATE IMPROVEMENT, INC., STEVEN KNISH, and PATRICIA KNISH, | |
| Defendants. | |

    Andrew D. Parker and Anthony G. Edwards, PARKER ROSEN, LLC, for plaintiff.

    Kyle E. Hart, FABYANSKE, WESTRA, HART & THOMSON, P.A., for defendants Interstate Improvement, Inc. and Patricia Knish.

    Adam S. Huhta, HUHTA LAW FIRM, PLLC, for defendant Steven Knish.

    Plaintiff Brady Meyer brings this action against his former employer, Interstate Improvement, Inc. ("Interstate"), as well as Interstate's owners Steven and Patricia Knish. Meyer alleges that (1) he is entitled to a 25 percent ownership interest in Interstate and (2) Interstate failed to pay a bonus that he earned in 2012. This matter is before the Court on defendants' motion for summary judgment. For the reasons that follow, the Court grants defendants' motion in all respects, except insofar as the motion seeks dismissal of Meyer's breach-of-contract claim for failing to pay his 2012 bonus. That claim will have to be tried to a jury.

# I. BACKGROUND

Interstate[1] is a road-construction and repair company. Meyer is experienced in operating diamond-grinding machines, which are used to resurface existing roads. Meyer Decl. ¶¶ 4-5. In May 2005, Meyer attended an auction in Illinois at which Steven Knish ("Knish") purchased two diamond-grinding machines. Meyer Decl. ¶ 6. This caught Meyer's attention, as diamond grinders are expensive, complicated machines that rarely sell at auction. Meyer Decl. ¶ 6. Knish paid about $750,000 for the machines. Meyer Decl. ¶ 6.

Meyer contacted Knish to introduce himself and talk about Knish's plans for the two diamond grinders. Meyer Decl. ¶¶ 7-8. Knish told Meyer that he was looking for someone to run the diamond-grinding operation for his company. Meyer Decl. ¶ 8. The Knishes eventually agreed to meet with Meyer in Sheboygan, Wisconsin, where Meyer was working on a road project. Meyer Decl. ¶¶ 8-9.

During the meeting in Sheboygan, Knish offered Meyer a job establishing and overseeing Interstate's diamond-grinding operation. Meyer Decl. ¶ 10. Knish offered an hourly wage and also told Meyer that, if he was able to get the diamond-grinding operation off the ground and be successful, Meyer would receive a 25 percent ownership interest in the company. Meyer Decl. ¶ 10. Patricia Knish was present at the

---

[1]Interstate was formerly known as Knish Corporation.

meeting and also agreed to these terms. Meyer Decl. ¶ 10. Meyer accepted the offer. Meyer Decl. ¶ 11.

Over the next several years, Meyer oversaw all diamond-grinding operations for Interstate. Meyer Decl. ¶ 12. Meyer's duties included supervising the diamond-grinding work; hiring, firing, and training employees; choosing appropriate equipment for projects; purchasing diamond-grinding machines and blades; working with blade manufacturers' representatives; meeting with project inspectors and engineers; and assigning work crews. Meyer Decl. ¶ 12. Meyer had to travel extensively, and he often worked 100 hours per week. Meyer Decl. ¶ 13. During Meyer's tenure, Interstate became one of the largest companies in the diamond-grinding industry. Meyer Decl. ¶ 14; Weber Decl. ¶ 8. Meyer eventually became a salaried employee and also earned a bonus of a certain amount per square yard of road resurfaced; as of 2010, his bonus was three cents per square yard. Meyer Dep. 54, 89, 126, 128.

Meyer contends that, under the terms of the parties' oral agreement, he was entitled to a 25 percent ownership interest in Interstate as of January 1, 2008. Meyer also contends that he believed that he was in fact an owner beginning in 2008 and points to various statements made by Knish that (Meyer alleges) led him to believe that he had become an owner. For example, sometime in or before 2009, Knish told Meyer

that Meyer's 25 percent stake was worth $5 or $6 million.² Meyer Dep. 105, 107. On another occasion sometime before 2010, Knish asked Meyer whether Meyer would like to reinvest his bonus in order to receive more stock; Meyer chose not to do so. Meyer Dep. 124. Knish also told Meyer at various unspecified times that Meyer would be able to retire based on the value of his ownership interest and that Meyer would be able to buy out the Knishes' shares and take over the company when they retired. Meyer Decl. ¶ 16(c); Meyer Dep. 111, 153-54. Meyer also believed that he was an owner because the Knishes consulted with him about the company; for example, in 2009, the Knishes discussed with him whether Interstate should acquire another company. Meyer Dep. 168-71; Meyer Decl. ¶ 14.

---

²Meyer could not remember whether this conversation took place in 2009 or 2010. Meyer Dep. 105. He testified, however, that this conversation occurred sometime before he first asked Knish to put his ownership interest in writing. Meyer Dep. 107.

Meyer alleges that there were two occasions on which he asked Knish to put his ownership interest in writing. Meyer testified that the first of these occasions occurred in 2009 or 2010 and the second in the summer or fall of 2011 during a project on Interstate 94. Meyer Dep. 13-14, 30, 96, 155, 281. Defendants have produced records demonstrating that the Interstate 94 project took place in 2010 (not 2011), and Meyer now concedes that the second request must have been made in 2010. Pl.'s Mem. in Opp. to SJ at 16 n.4.

Given that Meyer testified that the first request was made about a year before the second request, *see* Meyer Dep. 13-14, that first request must have been made in or before 2009.

Twice during his tenure at Interstate, Meyer asked Knish to put Meyer's ownership interest in writing. Meyer Dep. 12. Meyer made his first request sometime in 2009 and the second request in the summer or fall of 2010. On both occasions, Knish responded that Meyer "didn't have to worry about anything," that Knish was "a man of his word," and that Meyer would "be taken care of." Meyer Dep. 12-13, 102.

Meyer was "very uncomfortable" with Knish's response to his second request and eventually contemplated starting a business of his own or trying to form a new partnership. Meyer Dep. 114-16. Meyer also noticed a definite change in the Knishes' conduct toward him and felt that they were trying to phase him out of Interstate. Meyer Dep. 25-30, 99-100. Before Meyer made his second request, Meyer was used to speaking with Knish several times per day. Meyer Dep. 25, 168-71. In the last year and a half of Meyer's employment, however, Meyer and Knish would go weeks without speaking. Meyer Dep. 25, 34. Other employees began taking over tasks that Meyer was used to performing, and Meyer learned that Interstate had contacted a sales representative at a diamond-blade company to find out what type of bonds Meyer used for the blades (rather than simply ask Meyer himself). Meyer Dep. 26-29, 34-36.

As of 2011, Meyer concluded that he was being phased out and was at risk of termination, although he still trusted the Knishes and did not think that he would actually be fired. Meyer Dep. 29-31, 34, 36. In February 2012, Meyer contacted three

road-construction companies to inquire about the possibility of some kind of partnership. Hart Decl. Exs. 6-8; Meyer Dep. 80-81, 113, 201-04, 210-14. Meyer testified that, although he was exploring his options, he still wanted to work for Interstate. Meyer Dep. 203-04, 206, 209, 212.

Knish terminated Meyer in December 2012. Meyer Decl. ¶ 17. In January 2013, Meyer began setting up his own (competing) business. Meyer Dep. 20. Meyer contacted the Knishes in March 2013 to ask about buying or leasing grinding equipment for his business. Hart Decl. Ex. 10; Meyer Dep. 183-85. In his email, Meyer did not say a word about his alleged ownership interest in Interstate. A few weeks later, Meyer emailed again, expressing irritation at the Knishes' response and stating that he would purchase other equipment. Hart Decl. Ex. 11; Meyer Dep. 192-93. Meyer also seemed to be demanding payment for a forklift that had not been returned to him. Again, however, Meyer did say anything about the fact that he allegedly owned 25 percent of Interstate.

Meyer testified that, before January 2013, he had not considered suing for his ownership interest because he did not have anything in writing and believed that he was "screwed." Meyer Dep. 20-22; *see also* Meyer Dep. 104-05, 148-50, 185-86, 193, 290, 292. That changed sometime after January 2013, when a friend told Meyer that he

might have a case. Meyer Dep. 19-20. Meyer contacted a lawyer and ultimately filed this lawsuit on November 21, 2013. ECF No. 1.

## II. ANALYSIS

### A. Standard of Review

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

### B. Ownership Claims

Meyer brings a breach-of-contract claim and an unjust-enrichment claim; both claims seek the 25 percent ownership interest in Interstate that defendants allegedly promised to him. The parties agree that these claims are governed by Minn. Stat. § 541.07(5), which provides a two-year statute of limitations for wage claims but extends that limitations period to three years for wage claims based on "willful" misconduct. *See Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 832 (Minn. 2011)

(noting that § 541.07(5) applies "whenever the gravamen of the action is the breach of an employment contract" (citation and quotations omitted)); *Roaderick v. Lull Eng'g Co.*, 208 N.W.2d 761, 763 (Minn. 1973) (applying § 541.07(5) to a quantum-meruit claim). For purposes of their motion, defendants do not dispute that three years is the applicable limitations period.

As noted, Meyer contends that he was entitled to a 25 percent ownership interest in Interstate as of January 1, 2008, and he agreed (at oral argument) that defendants were in breach of this promise as of that date. *See also* ECF No. 26 at 2 (Meyer's statement of the case asserting that Meyer was entitled to 25 percent ownership as of January 1, 2008); ECF No. 1 ¶ 60 (original verified complaint alleging that Meyer's ownership interest vested as of January 1, 2008).

Nevertheless, Meyer argues that, even though defendants breached the contract on January 1, 2008, the statute of limitations did not begin to run until defendants *expressly* reneged on the contract after Meyer was terminated in December 2012. Meyer is incorrect. Minnesota law is clear that breach-of-contract claims accrue—and the statute of limitations begins to run—when the breach occurs. *See Levin v. C.O.M.B. Co.*, 441 N.W.2d 801, 803 (Minn. 1989) ("it has long been settled that a cause of action for breach of contract accrues on the breach of the terms of the contract"). The cases that Meyer cites are not to the contrary. *See Park Nicollet Clinic*, 808 N.W.2d at 832 (breach-

of-contract clam accrues at the time of breach); *Medtronic, Inc. v. Shope*, 135 F. Supp. 2d 988, 992 (D. Minn. 2001) (same); *Parkhill v. Minn. Mut. Life Ins. Co.*, 174 F. Supp. 2d 951, 956 (D. Minn. 2000) (same).

Whether or not Meyer *thought* that he had been given a 25 percent ownership interest in the company by January 1, 2008 is not relevant; the limitations period begins to run on the date that the contract is breached, not on the date that the breach is discovered.[3] *See Jacobson v. Bd. of Trs. of the Teachers Ret. Ass'n*, 627 N.W.2d 106, 110 (Minn. Ct. App. 2001) (breach-of-contract claim accrues upon breach "even when actual damages resulting from the breach do not occur until some time afterwards or when the aggrieved party was ignorant of the facts constituting the breach"). Meyer claims that he was entitled to 25 percent ownership on January 1, 2008. If he is correct, then defendants were in breach on January 1, 2008 when they failed to deliver the promised

---

[3]Meyer's testimony and sworn statements contain confusing and contradictory claims concerning whether he subjectively believed that he was an owner. *Compare* Meyer Decl. ¶ 15 ("I believed I was an owner in the company starting in about 2008"), *with* Meyer Dep. 90 ("Q. Well, did you have an understanding as to when you would receive your ownership interest [after the first time you asked for it in writing]? A. No."); Meyer Dep. 91-92 ("Q. And Mr. Knish did not commit to any kind of a time line or deadline as to when you would receive a 25 percent interest in the company [after the first time you asked for it in writing]? A. No, he did not."); Meyer Dep. 103-04 (Meyer was concerned that he would never see his ownership interest); *and* Meyer Dep. 114 (after Knish refused to put his interest in writing, Meyer thought he was "screwed"). Whatever Meyer's subjective beliefs, however, there is no dispute that he was *not* given an ownership interest in Interstate on January 1, 2008, and therefore Interstate was (according to Meyer's theory) in breach of the parties' contract as of that date.

ownership interest. *See Park Nicollet Clinic*, 808 N.W.2d at 837 ("Failure to perform under a contract when performance is due establishes an immediate breach."). Meyer could have filed this action on January 2, 2008, but he waited until November 21, 2013—nearly *six years* later—to do so. His contract and unjust-enrichment claims are therefore untimely.

Meyer contends that defendants should be equitably estopped from asserting that his claims are time-barred. Meyer bears the burden of establishing the elements of equitable estoppel, which are: (1) that defendants made promises or inducements; (2) that Meyer reasonably relied on those promises or inducements; and (3) that Meyer will be harmed if estoppel is not applied. *Hydra-Mac, Inc. v. Onan Corp.*, 450 N.W.2d 913, 919 (Minn. 1990). Equitable estoppel does not toll the running of the statute of limitations; instead, the party asserting estoppel must have acted diligently once the circumstances creating the estoppel cease to exist. *N. Petrochemical Co. v. U.S. Fire Ins. Co.*, 277 N.W.2d 408, 411 & n.2 (Minn. 1979).

Meyer points to various statements of Knish that (Meyer says) misled him into believing that he was an owner of Interstate. These include Knish's statements that Meyer "didn't have to worry," that Knish was "a man of his word," and that Meyer would "be taken care of"; that Meyer stood to make millions of dollars from his ownership interest; that Meyer could reinvest his bonus to receive more stock; that

Meyer would be able to retire on his ownership interest; and that Meyer would take over the company when Knish retired.

These statements are too vague and open-ended to support the application of equitable estoppel. In *Schueller v. Knapp*, 107 N.W.2d 376 (Minn. 1961), the Minnesota Supreme Court held that the defendants could not be estopped from raising a statute-of-limitations defense when they had told the plaintiff that they would pay him "as soon as they could" and that the plaintiff "would not lose anything on them." *Id.* at 377. The Court gave short shrift to the plaintiff's equitable-estoppel argument: "It is clear that in the instant case there are no elements of estoppel . . . ." *Id.* at 378.

By contrast, in cases in which defendants have been estopped from relying on the statute of limitations, the defendants made much more concrete and specific representations that they would fulfill their obligations upon the occurrence of a particular event or the passage of a particular amount of time. *See Albachten v. Bradley*, 3 N.W.2d 783, 784-85 (Minn. 1942) (shortly before the statute of limitations expired on defendant's promissory note, defendant asked plaintiff for three extra months to pay); *Bottum v. Jundt*, No. A09-797, 2009 WL 5092747, at *1-2 (Minn. Ct. App. Dec. 29, 2009) (shareholder defendants repeatedly told plaintiff that they would pay plaintiff's bonus after the conclusion of one shareholder's divorce proceedings).

Knish's statements resemble the vague statements in *Schueller* that were not sufficient to support the application of equitable estoppel. Indeed, if anything, Knish's statements are even more vague. In *Schueller*, the defendants promised to pay "as soon as they could." Knish, by contrast, did not allude to timing *at all*. This is in sharp contrast to the statements in *Albachten* and *Bottum*, in which the defendants asked for additional time and made representations that they could pay at a particular time or on the occurrence of a particular event. As was true of the statements in *Schueller*, Knish's statements are simply inadequate to trigger estoppel.

Meyer's attempt to invoke equitable estoppel fails for the additional reason that, by the fall of 2010, any circumstances that could conceivably have given rise to equitable estoppel had dissipated. "Estoppel does not continue indefinitely if the circumstances relied on to justify estoppel cease to be operational. At that time plaintiff must proceed with due diligence to assert its claim against defendant." *N. Petrochemical Co.*, 277 N.W.2d at 411.

According to Meyer's own testimony, Knish's response to his second request to get his ownership interest confirmed in writing—which Meyer made sometime in the summer or fall of 2010—made Meyer "very uncomfortable." Meyer Dep. 114. Meyer noticed a definite change in Knish's treatment of him after the second request, which led Meyer to believe that defendants were planning to terminate him. Meyer Dep. 30-

31.  Many months before he was fired, Meyer went so far as to contact other companies to inquire about partnering with them.  After his termination in December 2012, Meyer waited nearly a year before he filed this lawsuit; prior to January 2013, Meyer assumed that he could not bring a lawsuit because he did not have anything in writing.

For a period of about three years before he filed this lawsuit, then, Meyer knew or certainly should have known that defendants were not treating him as an owner.[4]  Given that the statute of limitations itself is (at most) three years, Meyer's three-year delay from the time he first suspected that defendants intended to terminate his employment demonstrates a lack of diligence as a matter of law.  *Cf. Singleman v. St. Francis Med. Ctr.*, 777 N.W.2d 540, 544 (Minn. Ct. App. 2010) (plaintiff was not diligent where any grounds for estoppel disappeared seven or eight months before plaintiff commenced lawsuit); *City of Fergus Falls v. Sirny Architects, L.L.P.*, No. A05-1077, 2006 WL 330162, at *3 (Minn. Ct. App. Feb. 14, 2006) (plaintiff was not diligent where any grounds for estoppel disappeared two years before plaintiff commenced lawsuit).

---

[4]In fact, there is considerable evidence that Meyer knew or should have known that he was not an owner as of 2008.  For example, Interstate is a Subchapter S corporation, *see* Edwards Aff. Exs. H, I, yet Meyer has never received a distribution, even though he was likely entitled to annual distributions in 2008 and every year thereafter.  Moreover, Meyer has never even received an accounting of Interstate's earnings, which he would have needed—in 2008 and every year thereafter—to complete his tax returns.  *See Hubbard Cty. Health & Human Servs. v. Zacher*, 742 N.W.2d 223, 225 (Minn. Ct. App. 2007) ("The earnings or losses of a Subchapter S corporation pass through to its shareholders and are reported by the shareholders on their individual tax returns.").

Meyer points to his testimony that he nevertheless trusted the Knishes up until his termination. But Meyer does not identify anything that the Knishes did or said during this time—that is, after Knish rebuffed Meyer's 2010 request to get his ownership interest in writing—that could estop defendants from raising a statute-of-limitations defense. In his declaration, Meyer avers that Knish made statements "in the 2009-2012 timeframe" that led Meyer to believe that he was an owner of Interstate. Meyer Decl. ¶ 16. Meyer does not identify any post-2010 statements on which he relied, however; all of the statements that Meyer identifies were made in or before 2010 (or else Meyer could not recall when they were made). *Compare* Meyer Decl. ¶ 16(c) (no date identified for Knish's comments about Meyer taking over the company or being able to retire based on the value of his ownership), *with* Meyer Dep. 153-54 (Meyer could not remember when or what year Knish commented that Meyer could take over the company when the Knishes retired).

The Court therefore concludes that Meyer has failed to carry his burden to show that defendants should be equitably estopped from raising a statute-of-limitations defense. Because Meyer's breach-of-contract and unjust-enrichment claims relating to ownership of Interstate are untimely, the Court grants defendants' motion for summary judgment as to those claims.

## C. Bonus Claim

Meyer also brings a claim for a bonus that he alleges Interstate owes him for work that he performed in 2012. Meyer pleaded this as a claim for wages under Minn. Stat. §§ 181.13 and 181.171, which provide for penalties, attorney's fees, and other remedies if the employer does not pay a discharged employee all wages or commissions actually earned and unpaid within 24 hours after the employee's written demand.

Interstate argues that Meyer never made a written demand for wages and that Meyer is not entitled to a bonus because there is no evidence that bonuses were anything but discretionary. With respect to the latter point, the Court disagrees: Meyer testified that Knish agreed to pay him a bonus per square yard and that, in 2010, Knish increased the bonus to three cents per square yard. Meyer Dep. 54, 89, 126, 128, 232. This is sufficient to create an issue of fact concerning whether Meyer is entitled to a bonus for 2012. The fact that the parties did not have a specific agreement concerning *when* the earned bonus would be paid does not change the fact that, according to Meyer's testimony, he had a right to be paid that bonus.

With respect to the lack of a written demand, Meyer has withdrawn his claims for statutory remedies and now seeks to proceed solely on a breach-of-contract theory. Meyer's failure to make a written demand is therefore moot. Interstate objects, contending that Meyer should have to amend his complaint before he can proceed on a

breach-of-contract claim for the 2012 bonus. As Interstate itself argues, however, § 181.13 is merely a timing provision that governs when wages must be paid; to be entitled to its remedies, Meyer must first establish that he is contractually entitled to the wages he claims. *See Knutson v. Schwan's Home Serv., Inc.*, 711 F.3d 911, 917 (8th Cir. 2013). In other words, a breach-of-contract claim is necessarily subsumed within every § 181.13 claim. Count III of Meyer's amended complaint therefore put Interstate on notice of his breach-of-contract claim, and Meyer does not need to amend his complaint in order to pursue that claim.

For these reasons, the Court denies defendants' motion insofar as it seeks summary judgment on the breach-of-contract claim embedded within Count III.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. Defendants' motion for summary judgment [ECF No. 54] is GRANTED IN PART and DENIED IN PART.

2. The motion is DENIED as to Count III to the extent that count alleges a breach-of-contract claim for failure to pay plaintiff a bonus for 2012.

3. The motion is GRANTED in all other respects, and all other claims in plaintiff's amended complaint are DISMISSED WITH PREJUDICE AND ON THE MERITS.

Dated: November 17, 2015         s/Patrick J. Schiltz
                                 Patrick J. Schiltz
                                 United States District Judge